947 F.2d 951
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Martinez MALONE, Defendant-Appellant.
 No. 90-50538.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 9, 1991.
Decided Nov. 8, 1991.
 
 Before FLETCHER, D.W. NELSON and BRUNETTI, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Martinez Malone appeals from his conviction under 28 U.S.C. § 841(a)(1), possession of a controlled substance with intent to distribute. Malone argues that four errors by the district court must be remedied by dismissal of the charges or a new trial. We affirm.
 
 FACTS
 
 3
 On April 12, 1990, appellant Martinez Malone and his friend Paul Peters were travelling by bus from Long Beach, California to St. Paul, Minnesota. Owing to transit delays, they spent several hours waiting for their connection at the Los Angeles bus station. Two narcotics detectives from the LAPD--Loren Mauerhan and Herb Maples--were patrolling the station for drug courier activity. Mauerhan and Maples focussed their attention on Malone and Peters; they were acting "nervous" and displaying other characteristics that suggested to the detectives that they may have been transporting drugs. The detectives claimed that there were two plastic shopping bags between Peters' feet, and a black nylon sportsbag ("the black sportsbag") under Malone's. Around 7:00 PM, Peters cut to the front of the line at Gate 9, leaving the shopping bags behind him; Malone also approached the front of the line. Mauerhan and Maples took this to be evasive action, so they approached Malone.
 
 
 4
 At the supression hearing, the detectives testified that Mauerhan approached Malone, identified himself as a police officer, told Malone he was not under arrest and was free to leave, and asked permission to ask Malone a few questions. He asked to see Malone's bus ticket, which was tendered and returned. He then asked Malone some questions about his trip and about his luggage. Malone said that the black sportsbag was his, but that "some other guy" had packed it. Malone's evasive answers fueled Mauerhan's suspicions. He asked permission to search the black sportsbag, and Malone said, "Go ahead and look officer, but I think that other guy may have put some rock cocaine in there." After the search revealed 437 grams of rock cocaine (crack) divided into small parcels and taped inside articles of clothing, the officers arrested Malone and Peters.
 
 
 5
 Malone's version of events is markedly different. He claims that the black sportsbag belonged to a man he and Peters met on the bus from Long Beach, who they knew only as "L.T." or "L.G." (the "third man"). Malone's only luggage was one of the two shopping bags, which bore the Canon camera trademark ("the Canon bag"). The third man went to make a phone call shortly before 6:30 and asked Malone and Peters to watch his black sportsbag, which he left on the floor near a row of lockers. Near 7:00, Malone and Peters approached the front of the line at Gate 9 in order to help a middle-aged woman load her many packages onto the bus. When Mauerhan approached Malone and told him he was free to leave, Malone attempted to do so. Mauerhan then grabbed Malone and pushed him face first into the lockers, near the black sportsbag, and told him not to turn around. Malone denied owning the black sportsbag, and denied giving consent to search it.
 
 
 6
 The district court denied Malone's motion to suppress, saying:
 
 
 7
 This is one of those unusual motions to suppress were [sic] you [defense counsel] are going to have a second crack at it with the jury. I'm going to deny the motion. I'm going to find that it was a consentual [sic] search and that Mr. Malone was not under detention and knew he wasn't under detention and that the officer asked for permission to search and he gave it.
 
 
 8
 Following the arrest, the shopping bags, the black sportsbag, and the defendants were taken to the police station. The black sportsbag was searched closely for more hidden drugs. The contents of the shopping bags and the items carried by Malone and Peters were handled carelessly. No inventory was taken. Items were mixed together in piles on the table. Malone's leather jacket was destroyed. Mauerhan and Maples turned all of the evidence over to DEA Agent Bryan Wammack, informing him that the black sportsbag belonged to Malone and that the shopping bags belonged to Peters.
 
 
 9
 In late April, Wammack sent Peters a letter stating that Peters could pick up the shopping bags within 30 days, after which time they would be discarded. Peters never claimed the bags, so Wammack threw them away. Malone's defense counsel did not learn of this until the eve of the trial. He moved to dismiss the charges based on the destruction of potentially exculpatory evidence, claiming that the ability to prove that Malone owned the Canon bag was essential to corroborating Malone's version of events. The district court found that the shopping bags were discarded in good faith and then denied the motion, relying on Arizona v. Youngblood, 488 U.S. 51 (1988) (failure to preserve potentially exculpatory evidence does not violate due process without bad faith).
 
 
 10
 At trial, Malone reiterated his testimony that the black sportsbag belonged to the third man, and that he was only watching it temporarily. The prosecution argued that there was no third man, and that Malone had been carrying the black sportsbag all along. Nonetheless, the prosecution succeeded in obtaining a jury instruction that "the length of time a person possesses the illegal drug is immaterial; a short period of possession is sufficient." Defense counsel objected that this instruction could allow the jury to convict even if they believed Malone's story about watching the black sportsbag for the third man. The district court declined to give other prosecution instructions on joint possession and aiding and abetting, agreeing with defense counsel that they were unsupported by any evidence that Malone was acting in concert with the third man.
 
 
 11
 While deliberating, the jury discovered in one of the side pockets of the black sportsbag an announcement of a homeowners' association meeting to be held in Long Beach at 3325 Santa Fe Avenue ("the homeowners' notice"). Malone's address--at nearby 3345 Santa Fe Avenue--had already been admitted into evidence. The homeowners' notice had not been mentioned at trial or admitted into evidence. The jury requested further instructions.
 
 
 12
 Defense counsel moved for dismissal or a mistrial, arguing that the jury, in its excitement over having found evidence apparently linking Malone to the black sportsbag, would overestimate its importance and would not reach an impartial verdict. The district court denied the motions but reopened to admit evidence explaining how the homeowners' notice got into the black sportsbag. The testimony suggested that the notice had been either in the Canon bag or on Malone's person at the time of the arrest, and that it clearly had not been in the black sportsbag at that time. Upon further deliberation, the jury brought in a guilty verdict.
 
 
 13
 Malone appeals.
 
 DISCUSSION
 I. Motion to Suppress
 A. Standard of Review
 
 14
 The legality of a search and seizure is reviewed de novo. United States v. Linn, 880 F.2d 209, 214 (9th Cir.1989). Factual findings upon which the decision is based, however, are reviewed for clear error. United States v. Erwin, 803 F.2d 1505, 1508 (9th Cir.1986). Consent is a factual matter; a finding of consent is upset only if clearly erroneous. Id.
 
 B. Discussion
 
 15
 Malone raises two objections to the police procedures that led to his arrest. First, he argues that his questioning by police was an unlawful detention without reasonable suspicion. Second, he argues that he did not consent to search of the black sportsbag. Both of these issues turn largely on credibility.
 
 
 16
 Detention. Malone argues that he was detained without reasonable suspicion. The issue of reasonable suspicion, however, does not arise when a suspect has freely consented to questioning. The Supreme Court has established that
 
 
 17
 law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.
 
 
 18
 Florida v. Royer, 460 U.S. 491, 497 (1983).
 
 
 19
 The detectives' testimony indicates that they stayed within the bounds of Royer. Mauerhan testified that when he and Maples first approached Malone, they told him that he was not under arrest, not in trouble, and that he was free to leave. The officers returned Malone's bus ticket to him after they examined it, so he could board his bus. See Royer, 460 U.S. 491, 501 (1983) (police retaining suspect's plane ticket contributes to finding of seizure). While they stood near him, they did not touch him or draw their weapons. Detective Mauerhan spoke in a conversational tone at all times and did not threaten Malone.
 
 
 20
 In determining whether Malone was detained or seized for Fourth Amendment purposes during this conversation with the police, the "essential inquiry is whether the person stopped reasonably believed that he or she was not free to leave." Erwin, 803 F.2d at 1508 (quoting United States v. Patino, 649 F.2d 724, 726-27 (9th Cir.1981)). The verbal exchange described by the detectives does not amount to a "show of authority," United States v. Mendenhall, 446 U.S. 544, 553 (1980), that could cause Malone reasonably to believe he was not free to leave.
 
 
 21
 Malone's testimony on this subject differed significantly from the detectives' version. However, the district court believed the detectives. This credibility determination was not clearly erroneous.
 
 
 22
 Search of the black sportsbag. The search of the black sportsbag did not violate the Fourth Amendment if Malone freely and voluntarily consented to it. United States v. Safirstein, 827 F.2d 1380, 1383 (9th Cir.1987). Mauerhan testified that Malone consented to the search. The district court believed him. We find no clear error.
 
 II. Failure to Preserve Evidence
 A. Standard of Review
 
 23
 We find no direct precedent as to the standard of review to apply to a trial court's refusal to dismiss on account of the destruction of potentially exculpatory evidence. Since the good faith of the officer is a critical element of the determination, Malone urges de novo review. See, e.g., U.S. v. Hove, 848 F.2d 137, 139 (9th Cir.1988) (applying de novo review in context of good faith exception to the exclusionary rule).
 
 
 24
 Since it appears that Malone will not prevail on this issue even under the more favorable de novo standard, we assume that the de novo standard of review applies except when we review determinations of credibility and historic fact, which we review for clear error.
 
 B. Discussion
 
 25
 The consequence of the government's destruction of potentially exculpatory evidence in its custody is controlled by California v. Trombetta, 467 U.S. 479 (1984) and Arizona v. Youngblood, 488 U.S. 51 (1988). Trombetta held that to warrant dismissal, the
 
 
 26
 evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.
 
 
 27
 467 U.S. at 489. Youngblood added the requirement that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58.
 
 
 28
 Youngblood requires an animus on the part of the police beyond mere negligence. Appellant is unable to prove the necessary bad faith by the LAPD or the DEA. Nothing in the record suggests that DEA Agent Wammack acted in bad faith. He reasonably believed that the bags belonged to Peters. He had given Peters opportunity to reclaim them. It was not until after the bags were destroyed that Wammack learned that Malone might want them as evidence for his defense. Appellant further suggests that Mauerhan and Maples purposely misinformed Wammack about the exculpatory value of the shopping bags in hopes that he would discard or destroy them. Even if we assume that bad faith anywhere in the chain is sufficient, the record does not warrant a holding that Mauerhan and Maples acted in bad faith. Both detectives testified that the bags were under Peters' chair at the bus station and that Malone had disclaimed ownership of the shopping bags when he was arrested. The district court believed that testimony.
 
 III. Jury Instructions
 A. Standard of Review
 
 29
 A district court abuses its discretion if its instructions taken as a whole were misleading or inadequate to guide the jury's deliberations.[1] United States v. Kessi, 868 F.2d 1097, 1101 (9th Cir.1989).
 
 B. Discussion
 
 30
 Appellant contends that in the context of this case the instruction that "a short period of possession is sufficient" was misleading. Appellant argues that it allowed the jury to convict even (1) if it believed that Malone was merely watching the bag for the third man, or (2) if it believed that there was a third man, but that Malone was acting in concert with him. Conviction based on the first would be improper because Malone would lack the necessary knowledge and intent; the second, because no evidence of a conspiracy was offered at trial.
 
 
 31
 Reading the jury instructions as a whole, we conclude that the jury did not convict on the first theory. The jury had been instructed that one element of the crime was knowing possession of cocaine. Immediately before the challenged instruction, the jury was instructed on the meaning of "knowingly." If the jury believed that defendant was innocently watching the black sportsbag for the third man under the instructions given, it would have acquitted. As to the second theory--that Malone acted in concert with the third man--the record clearly reveals that the prosecution proposed three separate jury instructions in an effort to submit this theory to the jury. Two of the three instructions--joint possession and aiding and abetting--were rejected by the district court for precisely the reasons urged by appellant: that they suggested a conspiracy theory that had no support in the evidence. The third (the short-period-of-possession instruction) was given but in modified form.[2]
 
 
 32
 The dispositive issue, however, is not the prosecutor's purpose in proposing the instruction but whether the instruction, taken in context, could have misled or confused the jury. No instruction suggested conspiracy, joint possession or any other sort of group action, nor were there any such charges in the indictment. The prosecutor never argued that Malone was acting in concert with the third man; indeed all of his arguments on the subject were to deny his very existence. ("It just isn't true that there was a third man. It just isn't true.") Appellant relies on United States v. Buffalano, 727 F.2d 50 (2d Cir.1984), a case where a multiplicity of theories required a mistrial. The jury in this case faced none of the confusion faced by the Buffalano jury. The instructions allowed conviction on one theory only: that the black sportsbag belonged to Malone, that it contained cocaine and that Malone knew it. The challenged instruction did not allow the jury to convict on theories not argued and not supported by the evidence. The instruction was not necessary, but it could not have confused the jury.
 
 IV. The Homeowner's Notice
 A. Standard of Review
 
 33
 The decision to deny a mistrial is reviewed for abuse of discretion. It is the defendant's burden to demonstrate abuse. United States v. Escalante, 637 F.2d 1197, 1202 (9th Cir.), cert. denied, 449 U.S. 856 (1980).
 
 B. Discussion
 
 34
 When the jury discovered the homeowner's notice in the black sportsbag, defense counsel moved for a mistrial. Counsel's contention then, and now on appeal, is that the jury's excitement at having discovered potentially incriminating evidence on its own would cause jurors to overestimate its importance and lose impartiality.
 
 
 35
 If the jury believed that the homeowner's notice--which bore an address on the same block as defendant's--had been in the black sportsbag at the time of Malone's arrest, it would have been powerful circumstantial evidence linking Malone to the drugs. Allowing the jury to be swayed by such extrinsic evidence violates the principle that all evidence used against a criminal defendant "shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." Turner v. Louisiana, 379 U.S. 466, 473 (1965). In the Ninth Circuit, "the appellant is entitled to a new trial if there existed a reasonable possibility that the extrinsic material could have affected the verdict." United States v. Vasquez, 597 F.2d 192, 193 (9th Cir.1979). This standard has been held equivalent to the Chapman harmless error standard, so that a verdict may stand if the effect of the extrinsic evidence upon the jury was harmless beyond a reasonable doubt. Gibson v. Clanon, 633 F.2d 851, 853 (9th Cir.1980), cert. denied 450 U.S. 1035 (1981).
 
 
 36
 It is apparent that any possible adverse effect upon the jury from the discovery of the homeowner's notice was eliminated by the testimony that was heard upon reopening. Detectives Mauerhan and Maples testified that they did not find the homeowners' notice in the black sportsbag. Agent Wammack testified that he had seen the notice in a pile of items taken from Malone, and that it may have been placed in the black sportsbag inadvertently. Malone testified that the notice had been in a white sweat suit in the Canon bag. After this testimony, no juror could reasonably believe that the homeowner's notice had been in the black sportsbag prior to Malone's arrest. Furthermore, the entire incident bolstered defense counsel's argument that the police's inept handling of the evidence made any proof of Malone's possession of the black sportsbag less believable.[3]
 
 
 37
 The cases cited by appellant do not support his contention that a mistrial was required. The closest factual situation is found in Farese v. United States, 428 F.2d 178 (5th Cir.1970). In that case, a trial for transportation of forged securities, the jury discovered $750 in large bills inside a shirt inside an attache case. No further testimony was taken to explain or interpret the presence of the money. The Fifth Circuit panel reversed the conviction because they could not conclude that "it affirmatively appears from the whole record that [the discovery of the cash] was not prejudicial." Id. at 180 (quoting McCandless v. United States, 298 U.S. 342, 347-48 (1935)). As discussed above, the "whole record" in this case establishes just the opposite: that the discovery of the homeowner's notice by the jury was not prejudicial.
 
 
 38
 Appellant further argues that it was an abuse of discretion for the district court to have reopened the case for additional testimony. Rather than an abuse of discretion, the decision to reopen seems to have been the appropriate response to the concerns that make a jury's consideration of extrinsic evidence objectionable in the first place. In the ordinary case,
 
 
 39
 [i]t is impossible to offer evidence to rebut [extrinsic evidence], to offer a curative instruction, to discuss its significance in argument to the jury, or to take other tactical steps that might ameliorate its impact.
 
 
 40
 Gibson v. Clanon, 633 F.2d at 854. Reopening the case to admit evidence as to where the notice was prior to arrest corrected any misimpression the jury might have had.
 
 
 41
 Appellant's contention that the trial judge was required to declare a mistrial is simply wrong. Bagnariol explained that a trial court, "upon learning of a possible incident of juror [consideration of extrinsic evidence], must hold an evidentiary hearing to determine the precise nature of the extraneous information." 665 F.2d at 885. The supplemental testimony removed any reasonable possibility that the discovery of the homeowner's notice was prejudicial.
 
 CONCLUSION
 
 42
 For the reasons explained above, we AFFIRM.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 When a jury instruction is challenged as an incorrect statement of the law, it is reviewed de novo. United States v. Mundi, 892 F.2d 817, 818 (9th Cir.1989), cert. denied 111 S.Ct. 1072 (1991). Here, however, appellant claims not that the "short time of possession" instruction misstated the law, but that it misled or confused the jury
 
 
 [2]
 At oral argument, the United States Attorney claimed that the purpose of the instruction was to meet any concern that the jury might have that the arresting officers had observed Malone for only 15 minutes prior to his arrest. This assertion is belied by the record, which clearly reveals that the government requested the instruction to impart its theory of a conspiracy between Malone and a third person. The United States Attorney was irresponsible in the explanation he advanced at oral argument
 
 
 [3]
 The jury was also instructed to consider only evidence properly introduced at trial in reaching its verdict. See United States v. Bagnariol, 665 F.2d 877, 889 (9th Cir.1981) (similar instructions support a finding of harmless error), cert. denied sub nom. Walgren v. United States, 456 U.S. 962 (1982)