23 F.3d 409
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Xavier Cardel LARTIGUE; and William E. Haney, Defendants-Appellants.
 Nos. 93-5356, 93-5369.
 United States Court of Appeals, Sixth Circuit.
 April 26, 1994.
 
 Before: BOGGS and NORRIS, Circuit Judges; BELL, District Judge.*
 PER CURIAM.
 
 
 1
 Defendants-Appellants, Xavier Cardel Lartigue and William E. Haney, appeal their convictions for Conspiracy to Possess with Intent to Distribute Cocaine in violation of 21 U.S.C. Sec. 846 (Count I), and Aiding and Abetting in the Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. Sec. 841(a)(1), and 18 U.S.C. Sec. 2 (Count II).
 
 
 2
 The issues on appeal include the denial of the defendants' motions to suppress evidence, the denial of Haney's motion for judgment of acquittal, and the denial of Haney's motion for new trial. For the reasons that follow, we affirm the convictions of both defendants.
 
 I.
 
 3
 Prior to trial Defendants filed motions to suppress evidence which they claimed was obtained in violation of their constitutional rights. The district court denied the motions, reasoning that at the time the officers sent for the warrant, they had probable cause for the same, and that any information obtained after the defendants were informed they were not free to leave was not essential to the warrant. On appeal Defendant Lartigue contends that the detention of his suitcase for over four hours while a search warrant was obtained exceeded the time permitted for a seizure of property on less than probable cause. Defendant Haney contends that his post-search detention constituted an arrest without probable cause.
 
 
 4
 In reviewing a district court's denial of a motion to suppress, this court must accept the findings of fact upon which the district court relied unless those findings are clearly erroneous; however, the district court's application of the law to the facts, such as a finding of probable cause, is reviewed de novo. United States v. Thomas, 11 F.3d 620, 627 (6th Cir.1993).
 
 A.
 
 5
 The facts pertaining to the seizure at issue in this case are not disputed. Officer David Bunning's testimony at the evidentiary hearing was not contraverted. This evidence must be reviewed in the light most likely to support the district court's decision. United States v. Williams, 962 F.2d 1218, 1221 (6th Cir.), cert. denied, 113 S.Ct. 264 (1992).
 
 
 6
 On the morning of July 1, 1992, Officer Joe Jones briefed Officer Bunning and several other members of the Cincinnati/Northern Kentucky International Airport Narcotics Interdiction Unit regarding information he had just received from the Los Angeles Airport Narcotics Task Force. He advised that two black males had purchased one-way tickets from Los Angeles to Cincinnati via Chicago, Illinois, using 8 one-hundred dollar bills. The tickets were purchased, under the names Terrance Wright and Benjamin Wright, one hour before the flight left." He gave a description of Terrance Wright and of his checked luggage. He also advised that Terrance Wright was on probation for a previous drug offense, and that Benjamin Wright was an alias for Gregory Smith, who was on parole for drug offenses.
 
 
 7
 Several months earlier Officer Bunning had received information from the DEA in Louisville, Kentucky, that an organization headed by an individual named Troy McFarland was moving cocaine and cocaine base from Oakland, California into Louisville and Indianapolis, Indiana. The organization was known to be using the Cincinnati airport and the couriers were posing as students at the University of Louisville.
 
 
 8
 On the morning of July 1, 1993, several officers set up surveillance at the airport to await the arrival of the 9:30 a.m. flight from Chicago. Officer Bunning observed Terrance Wright (later identified as Defendant Xavier Cardel Lartigue) deplane and walk toward the baggage claim area. He appeared to be very nervous and repeatedly turned to look behind him. About 35-40 seconds later Benjamin Wright (later identified as Defendant William E. Haney) deplaned pulling a carry-on bag. He remained 10 to 15 feet behind Terrance Wright. The two did not converse or acknowledge each other's presence. Benjamin Wright walked over to the telephones and attempted to make several long distance calls to the 502 area code which encompasses Louisville and Western Kentucky. He walked back toward Terrance Wright, but the two showed no sign of recognition. A suitcase matching the description received from Los Angeles was retrieved by Terrance Wright. At that time Benjamin Wright and Terrance Wright had a brief conversation. Benjamin Wright then walked away towards the front doors of the terminal.
 
 
 9
 Officer Bunning approached Benjamin Wright, identified himself as a police officer, and asked to speak to him. Benjamin Wright said he was coming from Los Angeles. When he was asked for his ticket he said his cousin had it and pointed to Terrance Wright. He identified himself as Rolling B. Wright, and confirmed the spelling as R-O-L-L-I-N-G. He said he had no identification because he left it in California. He said he lived in Louisville and had been in Los Angeles visiting relatives. On further questioning he said his name was Benjamin Wright, that he had a Kentucky driver's license and that he lived on Muhammad Ali Drive in Louisville. He said he could not remember his driver's license number or his social security number. He then changed his story and said that he lived in Oakland, California and was on his way to the University of Louisville to start attending classes. During the questioning Haney broke into a sweat, his hands were shaking and his voice was quivering.
 
 
 10
 While Officer Bunning was talking to Benjamin Wright, Officer Carl Parker spoke to Terrance Wright. In response to questioning, Terrance Wright produced both airline tickets, which proved to be one-way cash tickets, and a California driver's license with an Oakland, California address.
 
 
 11
 At this point Officers Bunning and Parker identified themselves as narcotics investigators and asked both defendants for consent to search their bags and persons. The defendants initially agreed to the search and followed the officers to the first aid room. Terrance Wright refused to go into the room. Officer Bunning told the defendants that if they refused the search he would try to obtain a federal search warrant. Both refused the search. Officer Bunning reiterated that they would be detained while he tried to obtain a search warrant. Benjamin Wright then reentered the room, emptied his bag out on the bed, and said the officers could search his bag since he had nothing to hide. He also consented to a search of his person. The officers found no contraband drugs.
 
 
 12
 Since Terrance Wright continued to refuse to allow a search, Officer Bunning advised both defendants that they would be detained while the officers attempted to obtain a search warrant. Officer Swauger came into the room and read the defendants their Miranda rights. At that point less than 10 minutes had elapsed since the officers first approached the defendants.
 
 
 13
 Within the next several minutes, before leaving the airport terminal, the officers received conflicting stories from the defendants regarding their reasons for sitting separately on the plane and who would be picking them up from the airport.
 
 
 14
 The defendants were transported to the Airport Police Department. Officer Bunning contacted the United States Attorney's office for assistance with the warrant application and began drafting the affidavit in support of search warrant. In the meantime the defendants were interviewed further by Officer Swauger. The defendants gave conflicting information regarding how the tickets were purchased and how they obtained their California driver's licenses. Swauger also established that Terrance Wright had given a false telephone number on his baggage tag.
 
 
 15
 The affidavit and warrants for a search of Terrance Wright's bag and person were typed and presented to a magistrate at the federal court in Covington, Kentucky. The warrant acknowledged that a narcotics canine had been run over Lartigue's bag and did not alert. The warrant was signed at 12:50 p.m. and was executed at 1:50 p.m., approximately 4 hours after the initial stop. Two kilograms of cocaine wrapped tightly in brick form in layers of plastic wrap were found in the suitcase. Defendants were arrested for possession of a controlled substance.
 
 B.
 
 16
 Defendant Lartigue contends that the detention of his suitcase exceeded the time permitted for a seizure of property on less than probable cause and that the warrant improperly relied on evidence obtained after the defendants were unlawfully detained. The analysis of Lartigue's claims requires this Court to evaluate what the officers knew, when they knew it, and how they obtained that knowledge.
 
 
 17
 The Fourth Amendment does not prohibit police officers from approaching individuals at random in airport lobbies to ask them questions and to request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate. Florida v. Bostick, 111 S.Ct. 2382 (U.S.1991). "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." United States v. Mendenhall, 446 U.S. 544, 554 (1980). See also United States v. Ushery, 968 F.2d 575, 578 (6th Cir.), cert. denied, 113 S.Ct. 392 (U.S.1992). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968).
 
 
 18
 It is well settled that police officers may stop a person for investigative purposes where, considering the totality of the circumstances, the officers have a reasonable and objective basis for suspecting that particular person is engaged in criminal activity. Terry, 392 U.S. at 21-22; United States v. Cortez, 449 U.S. 411, 418 (1981); Williams, 962 F.2d at 1223.
 
 
 19
 In United States v. Place, 462 U.S. 696 (1983), the Supreme Court considered the application of the Terry stop to the warrantless seizures of luggage on the basis of less than probable cause. The Court concluded that "when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of Terry and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope." 462 U.S. at 706.
 
 
 20
 The scope of activities permitted during an investigative stop is determined by the circumstances that initially justified the stop. United States v. Obasa, --- F.3d ----, No. 93-5483, 1994 WL 28437 (6th Cir. February 4, 1994). During an investigatory stop
 
 
 21
 the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.
 
 
 22
 Id. slip op. at 9 (quoting Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984)).
 
 
 23
 Neither of the defendants questions the fact that the officers' initial encounter with them was lawful. They only take issue with what occurred after the officers told them that they would be detained while they attempted to obtain a search warrant.
 
 
 24
 But it was the initial encounter, not the detention, that provided the officers with the information they needed for the search warrant. During that encounter they confirmed that defendants had made a cash purchase of one-way airline tickets from a source city under the names Terrance Wright and Benjamin Wright. They confirmed that the defendants were travelling together even though they had attempted to make it appear that they did not know each other. They learned that one held both tickets, that one claimed to carry no identification, that one said he was on his way to Louisville to attend the university, that they lived in Oakland, that they were nervous, that they gave inconsistent answers to routine questions, and that Haney's alleged address in Louisville was on Muhammed Ali Drive.
 
 
 25
 Facts uncovered by police officers during an investigative detention may cause their suspicion to ripen into probable cause to arrest. Adams v. Williams, 407 U.S. 143, 148 (1972). Probable cause to search exists if, considering the totality of the circumstances, there is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). The court should consider the evidence from the perspective of one who is trained in the field of law enforcement. Cortez, 449 U.S. at 417-18.
 
 
 26
 In this case defendants' answers to the officers' inquiries did not dispel their suspicions. They confirmed them.
 
 
 27
 Viewing the totality of the evidence from the perspective of trained law enforcement officers, the volume of incriminating evidence the officers were able to put together after their brief encounter with the defendants is striking. Defendants' behavior corresponded with the drug courier profile.[1] The fact that some of the factors relied upon by Officer Bunning were part of a "drug courier profile" does not detract from their evidentiary significance as seen by a trained agent. United States v. Sokolow, 490 U.S. 1, 10 (1989).
 
 
 28
 But these officers had more than the drug courier profile. All of the information they obtained from watching and talking to the defendants must be evaluated against the backdrop of information the officers had received from the Los Angeles Police Department and the DEA. The officers understood that the defendants had prior convictions for drug offenses, and that one was travelling under an alias. Officer Bunning was suspicious of Haney's claim that he lived on Muhammed Ali Drive because he believed it was a business district. Defendants' attempt to make contact with someone in the 502 area code, which includes Louisville, Haney's statement that he was going to school in Louisville, and defendants' revelation that they were from Oakland, were all consistent with the information the officers had obtained from the DEA regarding the Troy McFarland cocaine conspiracy. Every piece of evidence the officers obtained from the defendants fit in precisely with their previous knowledge and compounded their certainty that the defendants were transporting cocaine.
 
 
 29
 Defendants contend that the failure of canine "Pete" to alert on the bag negated the existence of probable cause. Defendants cite no authority in support of this proposition. Certainly, an alert by the drug dog would increase the officers' suspicions. On the other hand, the failure of a dog to alert does not nullify the officers' suspicions. Officer Bunning testified that he was aware of previous occasions where the narcotics dog had failed to detect the controlled substance because it was tightly wrapped and cleansed.
 
 
 30
 Based on the totality of the circumstances, there was a fair probability that contraband or evidence of a crime would be found in the unopened suitcase. There is no question that the officers had probable cause to search the suitcase prior to any arrest of the defendants. Accordingly, the search was lawful and the cocaine found as a result of the search was not subject to suppression.[2]
 
 C.
 
 31
 Regardless of whether or not the search warrant was valid, Defendant Haney contends that the reasonable suspicion which justified the investigatory stop was dispelled by the fruitless search of his suitcase. Thus, according to Haney, his continued detention after that point in time was illegal and the additional evidence gathered by Officer Swauger during his post-search detention should have been suppressed as fruit of the poisonous tree.
 
 
 32
 Defendant Haney's motion to suppress only sought suppression of physical evidence. After the suppression hearing, Defendant Haney filed a supplemental brief alleging that his detention was illegal and that all information obtained after his detention should be suppressed. The district court's opinion and order denying the motions to suppress only addressed the physical evidence seized pursuant to the search warrant. The district court did not separately analyze statements obtained from Defendant Haney during his detention.
 
 
 33
 Whether or not the detention violated Haney's Fourth Amendment rights depends on the degree of the restraint (whether it was an investigatory detention or an arrest) and the degree of the officers' justification for the restraint (reasonable suspicion or probable cause).
 
 
 34
 It is well settled that an investigatory seizure must be sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. United States v. Sharpe, 470 U.S. 675, 682 (1985). The Supreme Court has declined to set a rigid time limitation on investigative detentions. Sharpe, 470 U.S. at 685. In Sharpe, the Court held that a 20 minute detention did not convert a Terry stop into a de facto arrest where the police had pursued their investigation diligently and there was no delay that was unnecessary to a diligent investigation. 470 U.S. at 687. In Place, where the defendant's luggage was held for 90-minutes while it was subjected to a "sniff test" by a trained narcotics dog, the Court held that the "length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." 462 U.S. at 709.
 
 
 35
 Our prior cases have described the permissible time frame for a detention on less than probable cause as "extremely limited." See, e.g., United States v. Saperstein, 723 F.2d 1221, 1233 (6th Cir.1983). In United States v. Sanders, 719 F.2d 882, 883 (6th Cir.1983), we held that a three-hour detention of luggage went beyond the bounds of an investigative stop. In United States v. Winfrey, 915 F.2d 212 (6th Cir.1990), cert. denied, 498 U.S. 1039 (1991), we upheld a 10 to 15 minute detention on less than probable cause, but noted that the length of the detention "tested the outer limits of a Terry stop." Id. at 218.
 
 
 36
 Other factors besides time are considered in determining whether an investigative detention has evolved into a de facto arrest. While giving Miranda warnings to a detainee does not automatically convert a Terry stop into an arrest, it is evidence that the nature of the detention has grown more serious. Obasa, slip. op. at 10 (quoting United States v. Diaz-Lizaraza, 981 F.2d 1216, 1222 (11th Cir.1993)). The same is true with respect to transporting the defendants from a public place to a police station. Hayes v. Florida, 470 U.S. 811, 815-16 (1985).
 
 
 37
 The defendants in this case were told they would be detained while the officers attempted to obtain a warrant. They were given Miranda warnings and transported to the airport police department. The court is satisfied that when all the factors are viewed together--the Miranda warnings, the transport of the defendants and the length of the detention--there is no question that the detention evolved into an arrest and would not have been reasonable on less than probable cause.
 
 
 38
 Whether or not the officers had probable cause to arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense. Adams v. Williams, 407 U.S. 143, 148 (1972) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). See also Ushery, 968 F.2d at 579. The establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." United States v. Ogbuh, 982 F.2d 1000, 1002 (6th Cir.1993) (quoting Illinois v. Gates, 462 U.S. at 244 n. 13).
 
 
 39
 Haney contends that after the negative search of his bag and person, any reasonable suspicions revolving around him should have been eliminated. The court disagrees. The officers had ample reason to view Haney and Lartigue as a single entity and Lartigue's suitcase had not yet been searched. Their suspicions had not been dispelled.
 
 
 40
 Haney also assumes there was no probable cause to arrest because Officer Bunning testified that he felt he had enough probable cause for a search warrant but not for an arrest.
 
 
 41
 Officer Bunning's subjective determination as to whether or not he had probable cause to arrest is not determinative of the issue. This assertion was considered and rejected by the Supreme Court in Florida v. Royer, 460 U.S. 491, 507 (1983) (plurality). The officers who seized Royer at the airport and searched his suitcase did not believe there was probable cause to arrest and proceeded on a consensual or Terry-stop rationale. Nevertheless, the Supreme Court recognized that the officers' belief did not foreclose the State from justifying Royer's custody by proving probable cause. 460 U.S. at 507.
 
 
 42
 Whether or not there was probable cause must be assessed under an objective standard. United States v. Ferguson, 8 F.3d 385, 391 (6th Cir.1993). "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." Scott v. United States, 436 U.S. 128, 138 (1978), quoted in Ferguson, 8 F.3d at 388. Accordingly, the Court does not find Officer Bunning's testimony with respect to whether or not he had probable cause to arrest determinative on this issue.
 
 
 43
 In Royer, the Court held that at some point after Royer's initial stop at the airport, the officers' seizure of Royer matured into an arrest unsupported by probable cause. 460 U.S. at 503. The only evidence in Royer consisted of several elements of the drug courier profile. All the officers had was a nervous young man who paid cash for an airline ticket to a target city under an assumed name.
 
 
 44
 The slim and ambiguous evidence in Royer based upon only a few drug courier profile characteristics was found insufficient to support probable cause. In contrast, in this case, as outlined in detail above, the officers not only had a stronger drug courier profile. They had much more. They reasonably believed they were dealing with individuals with prior drug convictions, and all of the defendants' actions and statements confirmed the information the officers had about the Troy McFarland cocaine conspiracy. There was substantial evidence to give the officers probable cause to believe Haney had committed or was committing an offense.
 
 
 45
 The Supreme Court has recognized the "inherently transient nature of drug courier activity at airports" and the strong governmental interest in preventing the flow of narcotics into distribution channels. Place, 462 U.S. at 704. That transience is no where more evident than in this case. Defendant Haney had no identification and the officers reasonably believed he was using an alias and giving a phony address in Louisville; if they released him they would have seriously jeopardized their chances of ever finding him again. The officers had probable cause to believe that the suitcase held narcotics. They had probable cause to believe Lartigue and Haney were working together. If they were required to release the defendants while waiting for a search warrant for the suitcase, their ability to apprehend would be greatly frustrated.
 
 
 46
 Moreover, the Court is satisfied that even if the officers did not have probable cause to arrest, any error in the failure to suppress Haney's statements to Officer Swauger was harmless. The specific information Haney contends should have been suppressed were his statements regarding his address in Oakland, that he was flying with Lartigue, that he purchased his own ticket, that he was on his way to Cincinnati and then to Louisville, and his answers to questions regarding issuance of four driver's licenses under the name Wright.
 
 
 47
 Information that Haney lived in Oakland, that he was flying with Lartigue and that he was headed to Louisville had already been obtained by Officer Bunning prior to any detention. The fact that four licenses in the name of "Wright" had been issued on the same day was also known to Officer Swauger based upon a records search that was independent of any information obtained from Haney after his search. Because these statements had an independent source, they are free of any "taint" associated with the detention and are not subject to suppression. Segura v. United States, 468 U.S. 796, 805 (1984). Haney's additional statement as to the reason why the four Wrights went to get licenses on the same day, and his statement that he purchased his own airline ticket, even if technically subject to suppression, are harmless.
 
 II.
 
 48
 Defendant Haney contends that the district court erred in denying his motion for judgment of acquittal because the evidence adduced at trial was insufficient to sustain his conviction on the conspiracy and aiding and abetting charges.
 
 
 49
 He contends that regardless of the propriety of the detention of Lartigue, the evidence was insufficient to connect him to Lartigue's suitcase because there was no evidence that he exercised any control over the suitcase. He points to the fact that he cooperated with the police, consented to a search of his own bag, and encouraged Lartigue to consent to a search. Moreover, during the course of the trial Defendant Lartigue, through counsel, advised the jury that he was guilty of possession with intent to distribute the subject cocaine, but that he acted alone and Haney was not involved.
 
 
 50
 In reviewing a claim of insufficient evidence, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Ellzey, 874 F.2d 324, 328 (6th Cir.1989) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). This Court "will reverse a judgment for insufficiency of evidence only if th[e] judgment is not supported by substantial and competent evidence upon the record as a whole ... whether the evidence is direct or wholly circumstantial." Ellzey, 874 F.2d at 328 (6th Cir.1989) (quoting United States v. Stone, 748 F.2d 361, 363 (6th Cir.1984)).
 
 
 51
 Applying the above standard, we conclude that the evidence was clearly sufficient to support Haney's convictions.
 
 
 52
 To be found guilty of the crime of aiding and abetting a criminal venture, a defendant must associate himself with the venture in a manner whereby he participates in it as something that he wishes to bring about and seeks by his acts to make succeed. United States v. Knox, 839 F.2d 285, 294 (6th Cir.1988), cert. denied, 490 U.S. 1019 (1989).
 
 
 53
 With respect to the conspiracy charge, the government was required to prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join, and participated in the conspiracy. United States v. Lloyd, 10 F.3d 1197, 1210 (6th Cir.1993) (quoting United States v. Lee, 991 F.2d 343, 348 (6th Cir.1993)). The government was not required to prove a formal agreement. It was only required to prove that the members of the conspiracy had at least a tacit agreement or mutual understanding to try to accomplish an unlawful goal. Lloyd, 10 F.3d at 1210. Circumstantial evidence is sufficient to prove the elements of conspiracy, and "[i]t is not necessary that circumstantial evidence remove every reasonable hypothesis except that of guilt." Id. (quoting United States v. Stone, 748 F.2d 361, 363 (6th Cir.1984)).
 
 
 54
 Defendant Haney argues that his cooperation and the fruitless search of his bag should have eliminated all the suspicion associated with him. Haney is essentially requesting the court to weigh the evidence. "In addressing sufficiency of the evidence questions, this Court has long recognized that we do not weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury." United States v. Hilliard, 11 F.3d 618, 620 (6th Cir.1993), cert. denied, 114 S.Ct. 1099 (U.S.1994). The evidence, viewed in a light most favorable to the government, was sufficient that a reasonable juror could have inferred Haney's connection to the cocaine in Lartigue's suitcase. There was evidence that Haney was travelling with Lartigue, on a ticket purchased and held by Lartigue, but that Haney initially attempted to conceal his association with Lartigue. There was also evidence that he placed telephone calls to the 502 area code, that he was very nervous, and that he deliberately misrepresented his identity and his residence to the police officers. Finally, there was evidence that at the time of his arrest he was wearing a Pro Weight Heavy-Tee T-shirt, identical to the shirts wrapped around one of the bricks of cocaine in Lartigue's suitcase.
 
 
 55
 The district court correctly determined that the circumstantial evidence linking Haney to the contents of Lartigue's bag was sufficient to support the jury's verdict that Haney conspired to possess cocaine and knowingly and intentionally aided and abetted in the possession of cocaine with the intent to distribute it. The district court properly denied the motion for judgment of acquittal.
 
 III.
 
 56
 Defendant Haney contends that the district court erred in denying his motion for new trial based upon the introduction of prejudicial extraneous evidence into the jury deliberations.
 
 
 57
 During the trial, Lartigue's suitcase was admitted as evidence. No motion was made to admit the individual items within the suitcase. However, a series of photographs taken during the search showing the contents of the suitcase was admitted. Three pairs of shoes were visible in the photographs. The suitcase was sent into the jury room during deliberations.
 
 
 58
 After the verdict was entered, one juror signed an affidavit stating that the jurors had been deadlocked as to the conspiracy charge, Count I, that the suitcase had then been opened, and that the presence of shoes of different sizes had convinced them that Mr. Haney knew about the cocaine and conspired with Mr. Lartigue.
 
 
 59
 The district court ruled that the contents of Lartigue's suitcase constituted extraneous evidence, but found that the admission of the photographs rendered any defect in the consideration of the suitcase contents harmless error.
 
 
 60
 On appeal, the district judge's decision whether to grant a mistrial because of the jurors' use or exposure to extraneous matter will be reviewed only for abuse of discretion. United States v. Griffith, 756 F.2d 1244, 1252 (6th Cir.), cert. denied, 474 U.S. 837 (1985).
 
 
 61
 A defendant's Sixth Amendment right to a fair trial includes the right to be confronted with the witnesses and evidence against him. Farese v. United States, 428 F.2d 178 (5th Cir.1970). When a jury considers extraneous facts not introduced in evidence, a defendant has effectively been denied the right to confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence. Hughes v. Borg, 898 F.2d 695, 700 (9th Cir.1990). When it appears that a jury has considered extraneous material, the defendant is entitled to a new trial if there is a "reasonable possibility" that the extraneous material could have affected the verdict. Id.; Farese, 428 F.2d at 180. A number of cases have found the error harmless where the government has shown that the extraneous material was merely duplicative of evidence properly introduced in open court or if it can demonstrate that the other evidence was so overwhelming that the jury would have reached the same result even if it had not considered the extraneous material. See, e.g., Hughes, 898 F.2d at 700; United States v. Guida, 792 F.2d 1087, 1092-94 (11th Cir.1986); United States v. Treadwell, 760 F.2d 327, 339 (D.C.Cir.1985), cert. denied, 474 U.S. 1064 (1986).
 
 
 62
 In Farese a composite exhibit consisting of an attache case containing shirts was introduced in evidence. During deliberations the jury found $750 in cash in the pocket of one of the shirts. The presence of the money had been unknown to the government or the defense. 428 F.2d at 179. The court held that the jury's discovery of the money was error and that the error was prejudicial. Id. at 182.
 
 
 63
 In Hughes a police report and a police officer's affidavit which had not been introduced into evidence were inadvertently given to the jury. Id. at 898 F.2d at 699. The Ninth Circuit held that a police report did not prejudice the verdict because it was duplicative of trial testimony.
 
 
 64
 The jury's consideration of the shoes in this case is more akin to the duplicative evidence in Hughes than to the concealed surprise evidence in Farese. The existence of the shoes was well known to the government and the defendants. The jury was also aware of the existence of the shoes. Several pictures showing the shoes had been introduced into evidence. None of the parties attached any significance to the fact that the shoes were of different sizes. None of the parties foresaw the significance the jurors would attach to the shoes.
 
 
 65
 Defendant Haney's concern in this case is the particular meaning allegedly attached to the shoes by the jurors. However, the fact that the jury allegedly found the shoes to be significant merely substantiates the truism that what weight the jury will ascribe to a given piece of evidence is often outside the control or imagination of those trying the case. The district court also noted that Haney's connection to the suitcase was supported by evidence that he was wearing a T-shirt identical to those wrapped around some of the cocaine.
 
 
 66
 The district court could reasonably conclude that the evidence that was improperly before the jury was cumulative of other evidence and did not pose a reasonable possibility of prejudice to the jury's verdict. We conclude that the district court did not abuse its discretion in ruling that the error was harmless.
 
 IV.
 
 67
 For the foregoing reasons we AFFIRM the district court's denial of Lartigue's and Haney's motions to suppress, AFFIRM the district court's denial of Haney's motion for judgment of acquittal, AFFIRM the district court's denial of Haney's motion for new trial, and AFFIRM the convictions of Defendants Lartigue and Haney.
 
 
 
 *
 The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 The "drug courier profile" is an abstract of characteristics found to be typical of persons transporting illegal drugs. Florida v. Royer, 460 U.S. 491, 493 n. 2 (1983)
 
 
 [2]
 Because the warrant for the search was based upon probable cause known to the officers prior to the arrest, even if defendants' detention was unlawful, that detention would not taint the subsequent search of the suitcase pursuant to the warrant. Segura v. United States, 468 U.S. 796, 814 (1984); United States v. Ponce, 947 F.2d 646, 651 (2nd Cir.1991), cert. denied, 112 S.Ct. 1492 (1992)